**[J-35-2016] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION, | : No. 10 MAP 2015 |
| | : |
| | : Appeal from the Order of the |
| Appellant | : Commonwealth Court at No. 228 MD |
| | : 2012 dated January 7, 2015 |
| | : |
| v. | : ARGUED: March 9, 2016 |
| | : |
| | : |
| COMMONWEALTH OF PENNSYLVANIA, | : |
| AND GOVERNOR OF PENNSYLVANIA, | : |
| TOM WOLF, IN HIS OFFICIAL CAPACITY | : |
| AS GOVERNOR, | : |
| | : |
| Appellees | : |

## CONCURRING AND DISSENTING OPINION

**JUSTICE BAER** **DECIDED: June 20, 2017**

Through today's decision, this Court takes several monumental steps in the development of the Environmental Rights Amendment, Article I, Section 27 of the Pennsylvania Constitution. I agree with many of the Majority's holdings, including Part IV.A.'s dismantling of the Commonwealth Court's *Payne*[1] test, which stood for nearly fifty years, the confirmation that the public trust provisions of the amendment are self-executing in Part IV.C., and the recognition in footnote 23 that all branches of the

---

[1] *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973).

Commonwealth are trustees of Pennsylvania's natural resources.[2]  These holdings solidify the jurisprudential sea-change begun by Chief Justice Castille's plurality in *Robinson Township v. Commonwealth*, 83 A.3d 901, 950-51 (Pa. 2013) (plurality), which rejuvenated Section 27 and dispelled the oft-held view that the provision was merely an aspirational statement.  With this, I am in full agreement.

Nevertheless, I dissent from the primary holding of the case declaring various fiscal enactments unconstitutional or potentially unconstitutional based upon the Majority's conclusion that the proceeds from the sale of natural resources are part of the "trust corpus" protected by Section 27.  Maj. Op. at 34.  I reject my colleagues' reading of Section 27, which I find to be unmoored from the amendment's language and purpose.  As discussed below, the current decision imposes upon our sister branches of government private trust principles that are absent from the constitutional language and tangential to the forces motivating the adoption of Section 27.

As articulated in the extensive passage of *Robinson Township* quoted by the Majority, the Environmental Rights Amendment was enacted to address Pennsylvania's long history of environmental devastation resulting from the timber, hunting, and coal industries, as well as environmental disasters in the 1950s and 60s.  The Amendment aimed to prevent further pollution and the wasting of Pennsylvania's natural resources, as well-documented in the legislative history of Section 27, relied upon by the *Robinson Township* plurality.  *Robinson Township*, 83 A.3d at 960-963.  In contrast, there is neither constitutional language nor legislative history addressing the financial proceeds from the use or sale of natural resources.  It simply was not considered during the

---

[2] I additionally concur with the holding that the Oil and Gas Lease Fund is not a constitutional trust fund.  Maj. Op. at 45.

passage of the amendment. Protection of natural resources, not funding, was the focus of the amendment, and as expressed below, the two are not necessarily interrelated.

Through their actions today employing private trust principles to direct that all proceeds from Pennsylvania's public natural resources be funneled into environmental protection, my colleagues threaten to override the delicate process required of the legislative and executive branches to achieve a constitutionally-mandated balanced and fair budget. Despite a lack of support in the language of Section 27, hundreds of millions of dollars generated by the recent Marcellus Shale exploration on state land as well as proceeds from oil, gas, coal, timber, game and other natural resources, will be cordoned off from critical areas of the Commonwealth's budget, including education, infrastructure, and other public works, without consideration of whether such funding is necessary to protect Pennsylvania's public resources.[3]

As described below, I reject the imposition of inflexible private trust requirements and instead would interpret the language of Section 27 with an awareness of the public trust doctrine as it applied to natural resources at the time of Pennsylvania's enactment of Section 27. Utilizing this doctrine and the necessary presumption that our sister branches act in accordance with the Constitution, I conclude that the Pennsylvania Environmental Defense Foundation failed to meet its burden to prove the statutes "clearly, palpably, and plainly violat[e] the Constitution." *Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006). Accordingly, I would affirm the Commonwealth Court's order

---

[3] I recognize that the Majority has limited its holding to royalties and has remanded to the Commonwealth Court to determine whether other payments constitute proceeds from the sale of trust assets, which would be deemed part of the trust corpus, as opposed to income generated by the assets, which would not be deemed part of the corpus of the trust under private trust principles. Maj. Op. at 36. As I dissent from the stringent application of private trust duties relating to the corpus of the trust, I need not determine the validity of this dichotomy.

granting, in substantial part, summary relief to the Commonwealth and denying the Foundation's application for summary relief.

*A. The Language and History of Section 27.*

Analysis of the issues in this case begins with the language of Section 27, which provides as follows:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27. The Majority correctly observes that "the fundamental rule of construction which guides [this Court] is that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli v. AC&S Corp.,* 842 A.2d 919, 925 (Pa. 2004). Moreover, "technical words and phrases and such others as have acquired a peculiar and appropriate meaning . . . shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a).

I agree with the plurality in *Robinson Township* and the Majority in the case at bar that Section 27 contains two enforceable rights. Maj. Op. at 29; *Robinson Township*, 83 A.3d at 950-952. The first sentence of Section 27 provides a "right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." The second and third sentences, relevant to the case at hand, combine to create the people's right to have Pennsylvania's natural resources conserved and maintained. Specifically, the second sentence declares that "public natural resources are the common property of all the people, including generations yet

to come," and the third sentence requires the Commonwealth to act "as trustee" of the resources and to "conserve and maintain them for the benefit of all the people."

While the Majority imposes upon the Commonwealth private trust duties through the Uniform Trust Act, I do not find that the language of the Section 27 supports this analysis. Notably, Section 27 does not speak in terms of the people as "beneficiaries," nor does it define the resources in terms of the "corpus of the trust." Instead, it broadly provides that the resources are the "common property" of the people. Common ownership, however, does not grant individuals rights commensurate with private ownership. As aptly observed by the United States Supreme Court, "the right that we all possess to use the public lands is not the 'property' right of anyone." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999).

Rather than imposing private trust principles on the expansive rights granted by Section 27, I follow the lead of the plurality opinion in *Robinson Township* and rely upon the legislative history detailing the drafting and approval of Section 27 utilizing the public trust doctrine. *Robinson Township*, 83 A.3d at 955-56. Included in this legislative history is a statement by Representative Franklin Kury, the drafter and primary proponent of the Amendment ("Kury Statement"), integrating a legal analysis of the Amendment by Duquesne University Professor Robert Broughton ("Broughton Analysis"). 1970 Pa. Legislative Journal - House at 2269-82 (April 14, 1970).[4]

---

[4] I recognize and concur with the proposition that statements made by individual legislators are of limited value in determining the intent of the General Assembly as a whole regarding a statutory enactment, given that the individuals speak only for themselves. Notwithstanding, in this case, I find value in Representative Kury's statement and his submission of Professor Broughton's analysis as Kury authored the proposed constitutional amendment. Moreover, he drafted questions and answers circulated to inform the general public of the intent of the proposal prior to them voting to adopt the constitutional amendment. Exhibit UU to Petitioner's Brief in Opposition to Respondents' Cross Motion for Summary Judgment and Petitioner's Reply to Respondents' Response to Petitioner's Motions for Summary Judgment (reproducing (continued…)

Professor Broughton repeatedly explained that the second and third sentences of Section 27 "have the purpose of placing Pennsylvania among the jurisdictions which adhere to the public trust theory of public natural resource management."[5]  1970 Pa. Legislative Journal - House at 2273 (Broughton Analysis), 2275 (observing that the "primary purpose" of the final two sentences was "to constitutionally affirm that the public trust doctrine applied to the management of public natural resources in Pennsylvania").  Moreover, as explained below, the terminology used by the drafters of Section 27 evokes the public trust doctrine.

       1*. The public trust doctrine.*

The public trust doctrine has been part of common law for centuries even though it has not been "clearly enunciated" in Pennsylvania.  *Id.* at 2275 (Broughton Analysis). The lack of clarity of the doctrine, however, does not permit us to ignore the intent of the legislators drafting the amendment nor the voters adopting it, which was to employ public trust principles.  In other words, we should not fall back upon precepts of private trust law merely because they are familiar to us.  Instead, we should attempt to understand the underpinnings of the public trust doctrine invoked by Section 27.

As Broughton explained, the public trust doctrine, at base, invokes a fiduciary-like construct whereby the government has "the duty to manage, use, and/or consume the property of the public solely for the benefit of the public."  1970 Pa. Legislative Journal–

---

(…continued)
John C. Dernbach and Edmund J. Sonnenberg, *A Legislative History of Article I, Section 27 of the Constitution of the Commonwealth of Pennsylvania*, 24 Widener L.J. 181 (2015) (including Representative Franklin L. Kury's 1971 Question and Answer Sheet in favor of Pa. House of Representatives, Joint Resolution 3)).

[5] While the Majority relies upon Professor's Broughton's explanation that the Commonwealth must act as a trustee rather than a proprietor, Maj. Op. at 31, it fails to acknowledge that the professor utilized this dichotomy in describing the public trust doctrine, which the Majority relegates to a footnote.  Maj. Op. at 34 n.26.

House at 2273 (Broughton Analysis).  The concept of a public trust derives from English common law securing the public's ability to navigate, conduct commerce, and fish along the seashore and rivers and to travel and hunt in dedicated public common areas. Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 475-76 (1969) (hereinafter "The Public Trust Doctrine"); Joseph L. Sax, *Liberating the Public Trust Doctrine from its Historical Shackles*, 14 U.C. Davis L. Rev. 185, 189-91 (1980-81).  In language reflected in Section 27, the sovereign is deemed to hold the lands "as trustee of a public trust for the benefit of the people."  *National Audubon Society v. Superior Court*, 658 P.2d 709, 718 (Cal. 1983) (citation omitted).

Until the late 1960s, the concept had been applied primarily to navigable waterways and designated parklands, including fishing and hunting rights.  Indeed, a few of our sister states incorporated public trust provisions regarding navigable waterways and state lands into their constitutions long before Pennsylvania's adoption of Section 27.[6]  In connection with the environmental rights awakening during the years immediately preceding the 1971 adoption of Section 27, a movement developed to expand the previously limited public trust doctrine to encompass natural resources generally.  The expansion of the doctrine is largely credited to Professor Joseph Sax's seminal 1969 article, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, *supra*, which was relied upon by Professor Broughton in the legislative proceedings related to the adoption of Section 27.

---

[6] *See, e.g.,* VA. CONST. art. XI, § 3 (previously included as Section 175 of the Virginia Constitution of 1902, protecting the state's oyster bed and imposing specific limitations on the government); WA. CONST. art. 15, § 1 (incorporating the public trust doctrine to protect harbors and tide waters); *see also* Sax, *The Public Trust Doctrine*, 68 Mich. L. Rev. at 547 n.230-233.

A few principles can be distilled from the common law public trust doctrine, specifically in regard to the use and sale of resources. First, courts have generally safeguarded the public's continued use of trust property for its original purpose and have disfavored the sale of trust land to private parties where the conveyance does not support the purposes of the trust. *See* Sax, *The Public Trust Doctrine*, 68 Mich. L. Rev. at 477. Notwithstanding this general precept, the public trust doctrine does not forbid the state from developing, leasing, or even disposing of portions of trust property. *Id.* at 485-89.

Indeed, courts and scholars have recognized that "[a]s a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to the public trust uses." *National Audubon Society*, 658 P.2d at 728. These actions may be deemed permissible if the governmental entity has considered the effect of the action and attempted to "preserve, so far as consistent with the public interest, the uses protected by the trust." *Id.* The public trust doctrine, therefore, aims to limit but not eliminate the rate of alienation of the trust property in order to protect public expectations. Sax, *Liberating the Public Trust Doctrine from its Historical Shackles*, 14 U.C. Davis L. Rev. at 191-93; *see also* John C. Dernbach, *The Potential Meanings of a Constitutional Public Trust*, 45 Envtl. L. 463, 484 (2015).

Although it is permissible to dispose of portions of protected property, a government may be deemed to run afoul of its duties under the public trust if it disposes of excessive portions of the relevant property, especially for less than fair market value, or engages in transactions related to the public resources which benefit private entities rather than the public generally. Sax, *The Public Trust Doctrine*, 68 Mich. L. Rev. at 488-89 (emphasizing that disposition of trust property cannot be of "such amplitude that

the state will effectively have given up its authority to govern"), 537 (observing that public trust properties should not be used to benefit private entities).

A court faced with a questionable transaction will look to whether the legislative body clearly intended to dispose of the public trust property and may deem revocable any conveyances that are inconsistent with the purpose of the public trust. *See National Audubon Society*, 658 P.2d at 721 (discussing *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 453-54 (1892), in which the Supreme Court allowed Illinois to revoke a conveyance of nearly all the submerged lands of the Chicago waterfront to a private railroad). Importantly for purposes of this case, the doctrine encourages government entities to utilize any proceeds gained from the disposition of public property for the benefit of the general public. Sax, *The Public Trust Doctrine*, 68 Mich. L. Rev. at 547 (observing that disposition of public trust property "may be made only for full market value and that revenues from them must be devoted to replacement of specific trust uses or to statewide public purposes") (emphasis added). Thus, prior to getting into the specifics of the Pennsylvania Constitution, it is notable that the classic public trust doctrine does not contemplate what the majority holds. Monies from the sale of natural resources need not remain as the "corpus" of the environmental trust, but rather may be used for the general benefit of the public.

2*. The Public Trust of Section 27.*

Applying this summary of the public trust doctrine to the Pennsylvania Constitution, I observe that, consistent with my analysis above, the language of Section 27 does not employ private trust principles. Instead, Section 27 is broadly phrased to require the Commonwealth to "conserve and maintain" the public's natural resources for the benefit of all the people, including future generations. The phrasing invokes the original common law public trusts relating to navigable waterways described above,

pursuant to which the government acts as trustee "with a duty to manage, use, and/or consume the property of the public solely for the benefit of the people." 1970 Pa. Legislative Journal–House at 2273 (Broughton Analysis).

Conspicuously missing from Section 27 is any specific financial constraint. The Commonwealth's obligation is to conserve and maintain the public's natural resources regardless of the Commonwealth's current financial status. Thus, in the absence of funds from natural resources, the Commonwealth would be obligated to draw upon the general budget to provide any needed funds for conservation and maintenance. Conversely, if the Commonwealth experiences a windfall to the tune of a billion dollars from natural resources, the Commonwealth would still be required to fund conservation and maintenance needs but would not have to let any excess proceeds sit idle while critical public projects were left unfunded. Instead, the Commonwealth may use the excess in its sound discretion for the public's health, safety, and welfare, whether that be for education, infrastructure, or other necessary programs. The majority holds otherwise by mistakenly viewing this public trust as a private trust.

In rejecting the applicability of the public trust doctrine, the Majority criticizes the Commonwealth's reliance on *Illinois Central Railroad,* the seminal decision of the United States Supreme Court on the public trust doctrine. The Majority opines that *Illinois Central Railroad* "has nothing to do with the proper treatment of proceeds from the sale of trust assets." Maj. Op. at 34 n.26. The Majority is correct that the High Court did not discuss the proceeds of the sale, but it fails to recognize why. *Illinois Central Railroad* does not address the proceeds for the same reason Section 27 does not address the revenues from the sale of natural resources. Simply, the public trust doctrine is focused upon preserving the public's access to and enjoyment of the protected land and resources. It aims to prevent the destruction or privatization of public assets but has

nothing to do with creating a balance sheet accounting of assets as would be necessary under private trust law.

Consistent with the public trust doctrine's principle that the government should protect the public's access to trust property and limit the rate of alienation, I agree with Representative Kury who explained Section 27 as requiring that government actors demonstrate that a proposed action benefits the public interest in cases where the action might also impair natural resources.  1969 Pa. Legislative Journal-House at 722 (June 2, 1969) (Statement submitted by Rep. Franklin Kury).  He emphasized that the public interest in the environment should be "weighed against the interests of those who would detract from or diminish [the natural resources] before - not after - action is taken."  *Id.*  Consistent with Representative Kury's observations, Section 27's invocation of the public trust doctrine and the explicit reference to future generations precludes the "wasting of resources," but does not forbid the use of the resources for the current benefit of the public.  1970 Pa. Legislative Journal–House at 2273 (Broughton Analysis).

Accordingly, I agree with the *Robinson Township* plurality which opined that the Commonwealth has a prohibitory obligation "to refrain from performing its trustee duties respecting the environment unreasonably" and an affirmative obligation to act to protect the environment.  *Robinson Township*, 83 A.3d at 957-58.  Moreover, I further recognize that many of the basic principles underlying the public trust doctrine overlap with traditional duties of private trustees, including the requirement that a trustee act in the public's interest which requires loyalty, impartiality, and prudence.  *Id.* at 957.  Thus, I agree with the Majority and *Robinson Township* plurality to the extent they hold that the Commonwealth, as trustee under Section 27's public trust, should (1) exercise the duty of loyalty by administering the trust solely for the benefit of all the people, including future generations, (2) abide by the duty of impartiality by balancing the interests of all

the beneficiaries, including balancing the interests of current versus future generations, and (3) act with prudence by managing the resources with ordinary skill and caution. However, nothing in the history of Section 27 as detailed herein suggests that monies unnecessary to the conservation and maintenance of the environment must be cabined off from other pressing needs of the people of this Commonwealth. The Majority's holding in this regard is in error. [7]

Thus, I turn to specific issues regarding the interpretation of the Amendment raised by the parties before this Court.

*B. Analysis of the Foundation's challenges*

*1. "Trust corpus"*

---

[7] I observe that the above-listed principles governing Section 27's public trust align with the Supreme Court of Hawaii's interpretation of their similar constitutional amendment, which provides:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State for the benefit of the people.

HAW. CONST. art. 11, § 1. The Hawaiian high court recognized that the plain language of its constitution "manifests the framers' intent to incorporate the notion of the public trust into [the] constitution." *In re Water Use Permit Applications*, 9 P.3d 409, 443 (Haw. 2000) (citing this Court's decision in *Payne v. Kassab, 361 A.2d 263, 272 (Pa. 1976)* ("There can be no question that the [constitution] declares and creates a public trust of public natural resources for the benefit of all people")). The court explained that the "basic purpose of the trust" was to "reserv[e] the resource for use and access by the general public without preference or restriction" rather than for private commercial gain. *Id.* at 450.

At the heart of the Foundation's challenges to the various Pennsylvania legislative enactments addressed below is its contention that the provisions violate Section 27 by transferring Lease Fund monies from exclusively funding the DCNR's conservation activities to providing funding for the Commonwealth's General Fund, which can then be used for non-conservation activities. Underlying this issue is whether the proceeds from the sale of natural resources, such as the rents and royalties gained from the leases of oil and gas rights on Commonwealth land, should be considered part of the "corpus" of the Section 27 trust as would be the case for a traditional private trust. My colleagues in the Majority adopt the Foundation's view that the proceeds of Pennsylvania's natural resources, which include the oil and gas at issue in this case, are part of the "corpus" of the Section 27 trust, which can be used only for conservation and maintenance of Pennsylvania's public natural resources. Maj. Op. at 37.

As noted above, I disagree. Section 27 is silent regarding the creation of a "corpus" and in no way suggests that the proceeds from the sale of natural resources should be included in such a corpus. Instead, the focus of Section 27 is on the natural resources themselves, not the money gained from the resources.[8] The trustee's duties are to "conserve and maintain" the resources, not the money.

---

[8] Moreover, the Commonwealth observes that in contrast to Section 27's silence, other constitutional provisions clearly indicate when funds should be dedicated for specific purposes, such as the Motor Vehicle Licensing Fund, PA. CONST. art. VIII, § 11 (entitled: "Gasoline taxes and motor license fees restricted"), and the Land and Water Conservation and Reclamation Fund, PA. CONST. art VIII, § 16 (indicating, prior to the adoption of Section 27, that the fund created in the section was to be "used for the conservation and reclamation of land and water resources of the Commonwealth" and includes a list of specific uses). The absence of such designation in Section 27 regarding the proceeds of the well-established process of selling or leasing natural resources suggests, according to the Commonwealth, that the voters did not intend to encompass within the Section 27 corpus the proceeds from such sales including natural gas rents and royalties.

Moreover, Section 27 does not require that the Commonwealth conserve and maintain the resources for the benefit of the environment, but rather for the "benefit of all the people," which includes both the enjoyment of the natural environment but also the utilization of the resources, without waste, for the current benefit of the public. My conclusion is buttressed by the specific alterations of the language of Section 27 during the drafting process to allow for the Commonwealth's continued disposition of natural resources, including through logging and hunting, without any suggestion in the text of the Amendment that the funds had to be reinvested in the trust or used solely for trust purposes.

Originally, Section 27's third sentence provided, "As trustee of these resources, the Commonwealth shall preserve and maintain them in their natural state for the benefit of all the people." H.R. 958, Printer's No. 1105 (Apr. 21, 1969). During the drafting process, the word "conserve" was substituted for "preserve," and the phrase "in their natural state" was removed. The substitution of "conserve" was made to allay fears that "courts might interpret the word 'preserve' restrictively, to mean that if [the Department of Forest and Waters] authorized trees to be cut on Commonwealth land, or the Game Commission licensed hunters to harvest game, this would not be 'preserving' them." 1970 Pa. Legislative Journal–House at 2273 (Broughton Analysis).

Instead, the use of the term "conserve" requires that the resources be used prudently. As commonly understood, when a governing body during a drought issues an order for the public to "conserve water," the public may unquestionably still use water for drinking, bathing, and other household uses but should be careful to avoid wasteful use. Moreover, the removal of the phrase "in their natural state" emphasizes that the drafters of Section 27's language did not intend to freeze the current status of the natural resources nor to prevent the Commonwealth's ability to utilize the resources.

Taken together, these two changes demonstrate that the drafters contemplated the continued, but judicious, use of the resources rather than "some form of environmental absolutism." Dernbach Brief at 18.

Moreover, the questions and answers drafted by Representative Kury explaining the amendment to the voters did not suggest that any, let alone all, of the proceeds from the uses of natural resources would be devoted to the preservation of the environment; rather, the focus was upon requiring the government to "consider the people's rights before it acts," which is consistent with the public trust principles discussed above.[9]

---

[9] The purpose of the Amendment was explained to the voters as follows:

> Q. Will the amendment make any real difference in the fight to save the environment?
>
> A. Yes, once Joint Resolution 3 is passed and the citizens have a legal right to a decent environment under the State Constitution, every governmental agency or private entity, which by its actions may have an adverse effect on the environment, must consider the people's rights before it acts. If the public's rights are not considered, the public could seek protection of its legal rights in the environment by an appropriate law suit. The Resolution would benefit all of the people, and would go a long way toward tempering any individual, company, or governmental body which may have an adverse impact on our natural or historic assets.
>
> In short, the amendment will incorporate three broad principles into our legal system:
>
> 1. The people have the right to a decent environment.
> 2. Our public natural resources belong to all the people, including future generations.
> 3. The State is the trustee of these natural resources for future generations.

Representative Franklin L. Kury's 1971 Question and Answer Sheet in favor of Pa. House of Representatives, Joint Resolution 3, *supra* at 5 n.4.

Nevertheless, while I would hold that the proceeds may be used for public purposes other than conservation, the Commonwealth must act in a trustee-like capacity in regard to disposing of the underlying natural resources, as discussed above. Further, the legislative and executive branches must consider the funding level required by the DCNR and other conservation bodies to allow them to fulfill the Commonwealth's constitutional duty to maintain and conserve the people's natural resources. However, once the Commonwealth has conscientiously fulfilled these duties, it is not required to take the illogical step of leaving substantial monies unused in a fund for the environment while being unable to meet other pressing needs of the people. In deciding otherwise, the Majority is redrafting the Constitution to its own liking, ignoring the public trust doctrine, and usurping the appropriate role of the legislature in first assuring the conservation and maintenance of the environment and then meeting other pressing needs of the citizenry.

*2. Statutory challenges*

Having rejected the Foundation's claim that the funds generated by oil and gas leases on Commonwealth land must be held regardless of whether the Commonwealth's obligation to conserve and maintain the environment have been satisfied, the Foundation's arguments relating to the Fiscal Code Amendments and related budgetary decisions become amorphous. The Foundation's overarching claim is that the respective Governors breached their fiduciary duty because they did not investigate the impact of the budgetary changes on the DCNR's ability to fulfill its constitutional and statutory duties, under the CNRA, to conserve and maintain the public natural resources. Foundation Brief at 49, 52, 55-56.

I accept the Foundation's assertion that it is not challenging the sufficiency of the funding provided to the DCNR nor the DCNR's decision to enter into the leases, but

instead challenges the failure of the Governors to investigate the impact of the changes on the DCNR and the threat of the budgetary pressure to lease. Foundation Reply Brief at 38. I further agree with the Foundation that the Governor and all Commonwealth entities have a fiduciary duty as trustee of the people's natural resources to consider the effect of any contemplated action on the natural resources. *See Robinson Township*, 83 A.3d at 952.

A general duty to consider, however, does not translate into a justiciable cause of action. Courts are not equipped to determine what level of consideration is required. For example, should a court evaluate the proper consideration based on how many hours were spent contemplating the effects, how much money was expended researching the potential harms, or some indeterminate measure of how seriously our sister branches weighed the issue. These determinations are not only ill-defined but are entirely within the political realm reserved to the General Assembly and Governor.

Accordingly, I would affirm the Commonwealth Court's dismissal of the Foundation's claims that the Governors violated their fiduciary duties in regard to the budgetary provisions.